# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAI KUNZ, | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) **CIVIL ACTION** |
| | ) **NO. 14-13894-TSH** |
| TOWN OF NORTHBRIDGE, et al. | ) |
| Defendants. | ) |
| | ) |

## REPORT AND RECOMMENDATION

### March 13, 2017

Hennessy, M.J.

By Order of Reference dated July 26, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #71), this matter was referred to me for a report and recommendation on the motion for summary judgment filed by Defendants Brian Petrinelli, John Ouillette, Timothy LaBrie, Walter Warchol, Jarrod Woeller, and the Town of Northbridge (the "Town") (Docket #50) and on the motion for summary judgment filed by Kevin McCarthy (Docket #54).[1, 2]  Plaintiff Kai Kunz has responded to the motions.  (Dockets #63 and 67, respectively).  Defendant Police Officers and the Town have filed a reply.  (Docket #72).  A hearing on the motions was held on February 24, 2017.  (Docket #77).  This matter is now ripe for adjudication.  For the reasons that follow, I RECOMMEND that the motion for summary judgment filed by the Northbridge Defendants be ALLOWED IN PART

---

[1] The Town of Northbridge Police Department also moved for summary judgment.  (Docket 50).  However, at the hearing on the motions, Kunz assented to the Police Department's dismissal.

[2] Defendants Petrinelli, Ouillette, LaBrie, Warchol, and Woeller will hereinafter be referred to collectively as "Defendant Police Officers."  The Defendant Police Officers and the Town will hereinafter be referred to collectively as the "Northbridge Defendants."

AND DENIED IN PART and the motion for summary judgment filed by McCarthy be ALLOWED.

I.      BACKGROUND[3]

 On the morning of October 17, 2011, McCarthy called the Northbridge Police Department to report that Kunz had made threats against people whose names Kunz had written on a list, including a Northbridge Police Officer and an FBI agent. (DF 9).[4] Sergeant Ouillette was assigned to investigate these claims. (Id.). Over the phone, McCarthy told Sergeant Ouillette that Kunz had shown up at his house on the night of October 16, 2011 acting very strange. (DF 11). McCarthy said that Kunz started talking about a hit list and he saw the name "Brian Petrocelli" who Kunz claimed was a Northbridge Police Officer and an Agent Aldman who is an FBI Agent. (Docket #53-2 at 1). McCarthy said that Kunz told him that he had firearms and said he was going to kill the people on the list and rape and pillage at their houses. (Id.).

Northbridge Police Officers were able later that day to confirm that an Agent Joseph Aldman worked in the Worcester FBI Office and that he had previously interviewed Kunz. (Docket #53-2 at 1). While the Northbridge Police do not have an Officer Petrocelli, a Sergeant Petrinelli does work for the department, and had spoken with Kunz on October 14, 2011. (Id.). Kunz was well-known to the Northbridge Police at this time due to previous interactions with the Department. (DF 22). A regional broadcast was released by the Northbridge Police Department

---

[3] At the hearing on the motions, there was some confusion as to the operative compliant in this case. Although there is an amended complaint (Docket #26) listed on the docket, Judge Hillman granted a motion to strike that complaint (Docket 37). No subsequent motion was made to file an amended complaint. Thus, the operative complaint is the original complaint (Docket #1).

[4] The term "DF" refers to the Defendants' facts, which can be found in their Statement of Material Facts. (Dockets #52, 56). The statement of facts of the Northbridge Defendants and those of McCarthy are the same, with one exception; McCarthy's statement of facts includes one additional fact not contained in the Northbridge Defendants' statement. The term "PF" refers to Kunz's facts, which can be found in his Response to the Northbridge Defendants' Statement of Material Facts and to McCarthy's Statement of Material Facts. (Dockets #64, 68).

at 10:34 stating that Kunz had a "kill list," was mentally unstable, and believed everyone was out to get him.  (DF 24; Docket #53-5).

At some point on October 17, 2011, Sergeant Ouillette filled out an Application for and Authorization of Temporary Involuntary Hospitalization for Kunz pursuant to Mass. Gen. Laws ch. 123, § 12(a).  (Docket #53-8 at 1).

At 10:30 p.m. that same day, McCarthy again called the Northbridge Police Department regarding the ongoing issues between himself and Kunz.  (Docket #53-3 at ¶ 1).  McCarthy informed the dispatcher that he had just been involved in a physical altercation with Kunz, and had just left Haverhill and was on his way to the Northbridge Police Department.  (Id.).  McCarthy told the dispatcher that he had been able to wrestle away the "hit list" from Kunz and wanted to bring it to the Northbridge Police Station.  (Id.).  Approximately ten minutes later, Officer DeJordy called McCarthy on his cell phone and informed McCarthy that he should go to the Haverhill Police and that any investigation would have to be undertaken by them.  (Id.).  McCarthy stated that he was already over half-way to the Northbridge Police Station and would continue.  (Id.).

McCarthy arrived at the Northbridge Police Department at approximately 11:08 p.m.  (Docket #53-3 at ¶ 2).  McCarthy stated that Kunz had arrived at his residence and began questioning McCarthy about his involvement with the police, thinking that McCarthy had told the police about Kunz's "hit list."  (Id.).  McCarthy grabbed the "hit list" and tried to leave the residence.  (Id.).  McCarthy stated that Kunz then grabbed him by the throat and began choking him but that McCarth was able to get free when one of his friends intervened.  (Id.).  McCarthy turned over the "hit list" to Officer DeJordy, stating that Kunz had told him that those were the names of the people that were going to be killed. (Id.).  When questioned about weapons owned

by Kunz, McCarthy stated that he had seen Kunz with a stun gun and had only seen gun cases. (Id.).

Officer DeJordy questioned McCarthy's report because he observed no red marks on McCarthy's neck.  (Id.).  Officer DeJordy also questioned McCarthy's account about the amount of time that it took him to get to Northbridge after the alleged altercation, noting that he expected McCarthy approximately thirty minutes later than his arrival due to the length of time it takes to get from Haverhill to Northbridge.  (Id. at ¶ 3).  Officer DeJordy advised McCarthy several times during their conversation that he should be reporting the incident to the Haverhill Police on his way home.  (Id.).  McCarthy left the Northbridge Police Station at 12:10 a.m. on October 18, 2011. (Id.).  Prior to leaving, McCarthy called the Haverhill Police asking for an escort to his residence due to him being scared that Kunz was still in the area.  (Id.).

On October 18, 2011, at approximately 8:30 p.m., Kunz came to the Northbridge Police Station in response to a request from the Northbridge Police Department to Kunz that he come to the police station.  (DF 25; Docket #1 at ¶ 17).   Kunz was interviewed by Lieutenant LaBrie and Sergeant Petrinelli.  (Id.).  During the interview, Kunz was asked about the hit list.  (DF 28).  Kunz admitted he had made the list, but stated it was a list of people he had dealt with in the past and that McCarthy had asked him to make the list.  (PF 29).  Kunz stated that he was with McCarthy and Joe Young until approximately 10:30 p.m. on October 17, 2011, when McCarthy left the house due to a relative being involved in an accident.  (Docket #53-2 at 1-2).  Kunz indicated that he stayed at the house until about 12:30 a.m.  (Id.).

The officers also questioned Kunz about two fires that had taken place in Haverhill at properties belonging to McCarthy in the late evening of October 17, 2011 and the early morning of October 18, 2011.  (Id.; Docket #78).  Kunz denied any involvement.  (PF 32).  Kunz indicated

that, while in the presence of Young and McCarthy on October 17, 2011, Young had given him $60 in cash and asked him to fill up four gas cans in order to run a generator. (DF 33). Kunz filled up two five-gallon gas cans and two two-gallon gas cans and used the remaining money to put gas in his own truck. (DF 35). While Kunz spoke with Lieutenant LaBrie, Sergeant Petrinelli examined the exterior of Kunz's truck, which was parked outside the Northbridge Police Department. (Docket #53-2 at 2). Sergeant Petrinelli observed two red plastic two-gallon gas containers in the bed of Kunz's truck in plain view that appeared to be empty. (Id.).

After speaking with Kunz, the officers determined that it was in Kunz's best interest to go to the hospital for an evaluation regarding his current mental state. (Id.). The officers based their decision on their observation that Kunz's behavior was erratic and on the threats allegedly made towards Sergeant Petrinelli and Agent Aldman. (Id.). Lieutenant LaBrie advised Kunz that he wanted Kunz to go to Milford Hospital to be evaluated by a psychiatrist and that he had a "section 12" for Kunz to do so.[5] (DF 42). Kunz asserts that he did not agree to an evaluation. (Docket #64-2 at 5).

Kunz was transported by ambulance to the Milford Hospital. (Docket #53-11 at 3). Once in the ambulance Kunz was in the stretcher and restrained by five straps, as is required for every patient transported in Massachusetts. (DF 52). Kunz was evaluated in the emergency room and it was determined that he was "anxious, paranoid, suspicious and delusional." (Docket #53-12). On October 19, 2011, Kunz was transferred to Pembroke Hospital for an inpatient psychiatric evaluation and care, with a diagnosis of unspecified paranoia. (Docket #53-13). On October 21, 2011, Kunz was discharged. (Docket #53-15 at 2).

---

[5] Lieutenant LaBrie completed an Application for and Authorization of Temporary Involuntary Hospitalization for Kunz pursuant to Mass. Gen. Laws ch. 123, § 12(a) at 8:30 p.m. on October 18, 2011. (Docket #53-8 at 2).

On October 19, 2011, a warrant for Kunz's arrest was issued for Assault to Murder in violation of Mass. Gen. Laws ch. 265, § 15 by the Haverhill Police Department.  (Docket #53-16 at 2).  On October 22, 2011, Kunz was arrested by Detective Woeller.  (Id.).  Kunz was then turned over to the Haverhill Police Department.  (Docket #53-22 at 3-5).  Kunz was charged with Assault to Murder, but those charges were later dismissed on January 23, 2013 at the request of the Commonwealth.  (DF 70).

II.     STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III.    ANALYSIS

A.      The Northbridge Defendants

1.      Statutory Immunity

The Defendant Police Officers assert that they are immune from all of the state tort claims brought by Kunz pursuant to Mass. Gen. Laws ch. 123, § 22.  (Docket #51 at 8).  That section provides, in relevant part, "police officers . . . shall be immune from civil suits for damages for

restraining, transporting, applying for the admission of or admitting any person to a facility . . . if the . . . police officer . . . acts pursuant to this chapter."  The Defendant Police Officers assert that they are entitled to this statutory immunity as they were acting under Mass. Gen. Laws ch. 123, § 12(a) when they applied to have Kunz admitted for a mental evaluation after making a reasonable determination that he was a danger to himself and others.  (Docket #51 at 8).

Section 12 provides four different categories of procedures for seeking the involuntary hospitalization of an individual for a three-day period.  See Ahern v. O'Donnell, 109 F.3d 809, 816 (1st Cir. 1997).  The first two categories permit a "physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker" to restrain a person and apply for their hospitalization if they have "reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness." Mass. Gen. Laws ch. 123 § 12(a).  The fourth category establishes procedures for obtaining a warrant for the apprehension of persons who are potentially dangerous by reason of mental illness. Mass. Gen. Laws ch. 123, § 12(e).  Kunz was detained and transported under the category-three procedure, which provides:

> In an emergency situation, if a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker is not available, a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a 3-day period[.]

Mass. Gen. Laws ch. 123, § 12(a).

To qualify for statutory immunity under section 22, the Defendant Police Officers must establish that they complied with the requirements of section 12(a).  See Tarabolski v. Town of Sharon, No. 94-10045-Z, 1995 U.S. Dist. LEXIS 4284, at *6 (Mar. 16, 1995) (holding that when a police officer follows the statutory procedures of Section 12(a), he is not liable for state tort

claims pursuant to Section 22).  Hence, in order to be entitled to statutory immunity, the Defendant Police Officers must demonstrate that (1) there was an emergency situation; (2) a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker was not available; and (3) the police officer believed a failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness. Mass. Gen. Laws ch. 123, § 12(a); see Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) (Statutory interpretation "always starts with the language of the statute itself.").

Defendants have failed to show that there is no dispute of material fact with respect to the second element –that a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker was not available.  In fact, Defendants fail to even allege that element.  When questioned concerning this element at the hearing, defense counsel stated that this clause of the statute only applies if the emergency is at a medical facility, and is not applicable at a police station.  It is the court's duty to "to give effect, if possible, to every clause and word of a statute."  Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting United States v. Menasche, 348 U.S. 528, 538-39 (1955)).  Courts are thus "'reluctant to treat statutory terms as surplusage' in any setting."  Id. (quoting Babbitt v. Sweet Home Chapter, Communities for Great Ore., 515 U.S. 687, 698 (1995)).  I find that the exception suggested by Defendants does not exist in the terms of the statute and I will not read such an exception into the statute.  Hence, I cannot recommend that the Court find that the Defendant Police Officers are entitled to the statutory immunity of section 22.  See Hopper v. Callahan, 408 Mass. 621, 634 (1990) (holding that summary judgment based on a claim of immunity under section 22 was properly denied where a dispute of material fact existed as to whether the requirements of section 12 were followed).

In making this recommendation, I offer no opinion as to the proper definition of "available" as used in the statute.  A review of federal and state case law reveals that this specific issue has not been addressed.  I do note that Sergeant Ouillette initially drafted his Application for And Authorization of Temporary Involuntary Hospitalization pursuant to section 12 for Kunz on October 17, 2011, anticipating that Kunz was coming to the Northbridge Police Station on that date. (DF 47).  However, the operative application completed by Lieutenant LaBrie was not signed until 8:30 in the evening of October 18, 2011.  (Docket #53-8 at 3).  While it is possible that a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker was not available to apply for hospitalization of Kunz at the time Lieutenant Labrie filed his application, see Ahern, 109 F.3d at 813 (in holding that police officers acted consistently with section 12(a), court recounted timeline of events including fact that officers contacted a consulting psychologist in order to get an expert opinion over the phone of the likelihood that the plaintiff might pose an immediate danger); the timing of events allows for the possibility of an equally plausible opposite inference.  Defendants have failed to put forth sufficient information for the undersigned to decide the issue.

Because I find that the Defendant Police Officers are not entitled to the statutory immunity of section 22, I recommend that the court deny the motion for summary judgment as to the Defendant Police Officers with respect to counts VII, VIII, and the Intentional Infliction of Emotional Distress ("IIED") claim of count IX.

2.      Qualified Immunity

Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine

provides public officials "breathing room to make reasonable but mistaken judgments about open legal questions."  Ashcroft v. Al-Kidd, 563 U.S. 731, 743 (2011).  However, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful."  Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotations and citations omitted).

Courts use a two-part test to determine whether qualified immunity applies:  (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the alleged violation.  MacDonald v. Town of Eastham, 745 F.3d 8, 12 (1st Cir. 2014).  Under the second prong of the test, the analysis involves two questions:  (1) whether the legal contours of the constitutional right were sufficiently clear; and (2) whether in the specific factual context of the case, the violation would have been clear to a reasonable official.  Id.

> [A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it[;] [i]n other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate."

Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (quoting Al-Kidd, 563 U.S. at 741)).

Claims under Mass. Gen. Laws ch. 12, § 11I (the "MCRA") are subject to the same standard of immunity for police officers that is used for claims asserted under section 1983.

a.    The Section 1983 Claim

Kunz claims that his constitutional rights were violated when he was taken for the evaluation pursuant to section 12(a).  (Docket #1 at ¶¶ 57-68).  Specifically, Kunz asserts that he was unlawfully restrained, subjected to excessive force, was denied the right to counsel, and did not receive Miranda warnings prior to interrogation.  (Id.).  While I have previously found that the

Northbridge Defendants did not comport with all the requirements of section 12(a), a state law violation "is not inherently sufficient to support a § 1983 claim." Boveri v. Town of Saugus, 113 F.3d 4, 7 (1st Cir. 1997); see Durand v. Harpold, 807 F.3d 392, 394 (1st Cir. 2015) ("[Plaintiff] alleges violations of Mass. Gen. Laws ch. 123, § 12, but a state law violation is not itself enough to render a seizure unreasonable for Fourth Amendment purposes.").

i. Unlawful Restraint

"It is now well-settled that the Fourth Amendment's protections against unreasonable searches and seizures apply to the involuntary hospitalization of persons for psychiatric reasons." Ahern, 109 F.3d at 815. In Ahern v. O'Donnell, the First Circuit held that in the situation where a police officer applies for involuntary hospitalization under section 12(a), "Fourth Amendment standards require a showing of probable cause; that is, circumstances warranting a reasonable belief that the person to be seized does (as outlined in the statute) have a mental health condition threatening serious harm to himself or others." Id. at 817. Here, probable cause existed if, at the moment Kunz was "seized" for evaluation, the facts and circumstances reasonably believed by the Police Officer Defendants indicated that Kunz presented a likely threat of serious harm to himself or others by reason of mental illness. Id. Applying this standard, I find that the undisputed evidence outlined below demonstrates that the officers had probable cause to believe that Kunz needed to be evaluated by a mental health professional as soon as possible in order to determine whether he might be dangerous by reason of mental illness.

At the time that Kunz was "seized," the Police Officer Defendants had spoken to McCarthy who had reported that Kunz had assaulted him, was acting strange, had written a "hit list," had reported that he had firearms, and had threatened to kill the people on the list and rape and pillage at their houses. (Docket #53-2 at 1). McCarthy also presented the Northbridge Police with the

list, which included the names of "Brian Petrocelli," a Northbridge Police Officer and Agent Aldman, an FBI Agent.  (Id.; Docket #53-4).  Northbridge Police Officers were later able to confirm that an Agent Joseph Aldman worked in the Worcester FBI Office and that he had previously interviewed Kunz.  (Docket #53-2 at 1).  While the Northbridge Police do not have an Officer Petrocelli, a Sergeant Petrinelli does work for the department, and had spoken with Kunz on October 14, 2011.  (Id.).  Kunz was well-known to the Northbridge Police at this time as he had brought in large amounts of paperwork and notes that he had taken regarding people he suspected of watching him, dealing drugs, or trying to poison him or others; claims that were never substantiated.  (Id.).  Lieutenant LaBrie and Sergeant Petrinelli also conducted an in-person interview of Kunz, during which he admitted to making the list.  (Id.).  Kunz also admitted to being with McCarthy at McCarthy's home until approximately 10:30 pm on October 16, 2011, which encompasses the period of the alleged assault.  (Id. at 2).

The officers also knew that an arson had occurred on McCarthy's property, someone who had accused Kunz of assaulting him.  (Id.).  Kunz admitted purchasing gas six hours before the arson, and two gas cans that appeared empty were observed in Kunz's truck.  (Id.).  These observations did nothing to alleviate the idea that Kunz was a danger to himself or others; instead it highlighted the urgent need for the section 12(a) intervention, and supported the officers' probable cause determination.

## ii.  Excessive Force

Kunz claims that excessive force was used during his involuntary emergency mental health commitment.  (Docket #1 at ¶¶ 64-65.  The record indicates that this claim necessarily refers to restraints that were used to secure Kunz in the ambulance that transported him to Milford Regional Medical Center.  (See DF 52).

12

"To establish a Fourth Amendment excessive force claim, a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009).  Relevant factors "include 'the severity of the crime at issue,' the extent (if any) to which 'the suspect poses an immediate threat to the safety of the officers or others;' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

Once in the ambulance for transport from the Northbridge Police Station to the hospital, Kunz was restrained to a stretcher by five straps.  (DF 52).  This restraint protocol is required for every patient that is transported in the Commonwealth of Massachusetts.  (Id.).  These actions were clearly reasonable given the need to have Kunz evaluated by a mental health professional as soon as possible in order to determine whether he might be dangerous by reason of mental illness.

### iii.  Right to Counsel

Kunz also argues that the Police Officer Defendants violated his constitutional rights by failing to provide him notice of his right to counsel before his interview on October 18, 2011. (Docket #1 at ¶ 28).  But, because Kunz was not a defendant in a criminal prosecution or a party to a criminal proceeding, he had no Fifth or Sixth Amendment right to consult with an attorney prior to his transport to the hospital.  Zhuang v. Saquet, No. 09-12163-NMG, 2014 U.S. Dist. LEXIS 84165, at *17-18 (D. Mass. June 20, 2014).

Finally, Kunz argues that the Police Officer Defendant's failure to give him his Miranda rights prior to the interview violated his constitutional rights.  (Docket #1 at ¶ 63).  However, "a mere failure to give Miranda warnings does not, by itself, violate a suspect's constitutional rights or even the Miranda rule."  United States v. Patane, 542 U.S. 630, 641 (2004).  "Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."  Id.  For

13

this reason, the suppression of unwarned statements, "is a complete and sufficient remedy for any perceived Miranda violation." Id. at 641-42 (internal quotation and citation omitted). Kunz has no remedy for any Miranda violation in this action.

iv.    Chief Warchol

 "Qualified immunity protects 'supervisory officials from suit when they could not reasonably anticipate liability.'" Young v. City of Providence, 396 F. Supp. 2d 125, 131 (1st Cir. 2005) (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998)). Kunz alleges that Chief Warchol failed to prevent the alleged unconstitutional conduct by failing to instruct, supervise, control, and discipline his subordinates. (Docket #1 at ¶¶ 83-86). However, I have found above that Kunz does not have a cause of action against the Police Officer Defendants for a violation of his constitutional rights pursuant to section 1983. As there was no constitutional violation with respect to Kunz's section 12(a) application, I can find no constitutional violation on the part of Chief Warchol based on his supervisory duties.

Based on the above findings, I recommend that the Court grant summary judgment to the Northbridge Police Officers on count I and count V.

b.    The MCRA Claim

In count VI of his complaint Kunz brings claims under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, against the Northbridge Defendants alleging interference and/or attempted interference with his liberty, privacy, and due process rights under the United States Constitution and rights under the Massachusetts Constitution.[6] (Docket #1 at

---

[6] As an initial matter, I note that under Massachusetts law a municipality cannot be sued under the MCRA. Kelley v. Laforce, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citing Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 591-92 (2001)).

¶¶ 87-88).  The MCRA provides a remedy in the form of a civil action, allowing a person to institute a civil action:

> [w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth[.]

Mass. Gen. Laws ch. 12, §§ 11H, 11I.

For purposes of the MCRA, Massachusetts courts have defined "threats, intimidation or coercion" as follows:  "a 'threat' consists of 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm;' 'intimidation' involves 'putting in fear for the purpose of compelling or deterring conduct;' and 'coercion' is the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'"  Glovsky v. Roche Bros. Supermarkets, Inc. 469 Mass. 752, 762-63 (2014) (quoting Haufler v. Zotos, 446 Mass. 489, 505 (2006)).  The courts "employ a reasonable person standard in determining whether a defendant's conduct constitutes such threats, intimidation, or coercion.  Id. at 763.

At the hearing, to alleviate any confusion, I specifically asked Kunz's counsel to identify the "threats, intimidation or coercion" employed by Defendants.  Kunz's counsel responded that Defendants' misuse of the process was coercive.  However, this argument impermissibly conflates the requisite threats, intimidation or coercion with the alleged constitutional violation.  See Muldoon v. Dep't of Corr., No.: 15-cv-13892-DJC, 2017 U.S. Dist. LEXIS 17105, at *9 (D. Mass. February 7, 2017) ("the requisite threats, intimidation and coercion need to be separate from the alleged constitutional violation").  "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act.  Longval v. Comm'r of Corr.,

404 Mass. 325, 333 (1989); see Patino v. City of Revere, No. 13-11114-FDS, 2014 U.S. Dist. LEXIS 5639, at *30 (D. Mass. January 16, 2014) ("Allegations of excessive force and unlawful arrest, without more, have consistently been held not to constitute violations of the MCRA."); Farrah v. Gondella, 725 F. Supp. 2d 238, 248 (D. Mass. 2010) ("Here, [the administrator of the alleged victim's estate] has pled a violation of [the alleged victim's] Fourth Amendment right to be free from excessive force.  What is absent, however, is any showing (or even pleading) that the violation was intended to coerce [the alleged victim] into refraining from the exercise of a right or privilege secured by law."); Orwat v. Maloney, 360 F. Supp. 2d 146, 164-65 (D. Mass. 2005) (concluding that while inmate established a violation of the Eighth Amendment right to be free from excessive force, such violation directly impinged upon that right and thus did not amount to a threat, coercion, or intimidation for purposes of the MCRA).  Even if Kunz's commitment were a misuse of process, it was a direct act and did not seek to coerce Kunz to do or not to do anything.

As Kunz has failed to demonstrate the requisite threats, intimidation, or coercion required under the MCRA, I recommend that the court grant summary judgment to the Northbridge Defendants on count VI of the complaint.

3.     Municipal Liability

Pursuant to Mass. Gen. Laws ch. 258, § 2, "Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment[.]"  However, this section is not applicable to "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, . . . [or] invasion of privacy"  Mass. Gen. Laws ch. 258, § 10(c).  Kunz asserts that the Northbridge Police Defendants committed the following negligent or wrongful acts:  abuse

of process, malicious prosecution, IIED, and negligent infliction of emotional distress ("NIED"). (Docket #1).   Under section 10(c), Kunz is precluded from asserting a claim against the Town under section 2 for intentional torts.   Thus, the only claim that could be asserted on the basis of chapter 258 against the Town that is alleged in the complaint is NIED.

The Northbridge Defendants did not specifically address the NIED claim in their motion papers.   However, co-defendant McCarthy addressed the issue in detail in his motion for summary judgment, arguing that the claim should be dismissed because it had not been sufficiently pled.[7] (Docket #55 at 9).   This claim was also covered in depth during the hearing by both the Northbridge Defendants and McCarthy.   Therefore, I find that it is appropriate to address the NIED claim with respect to the Northbridge Defendants.

In order to recover for NIED, a plaintiff must prove:   "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Payton v. Abbott Labs, 386 Mass. 540, 557 (1982).   At the hearing, I expressly asked Kunz's counsel to point to the evidence that supported Kunz's claim that he had suffered physical harm manifested by objective symptomatology.   Conceding that there were no medical records supporting the claim, counsel responded that Kunz suffered sleeplessness, depression, and anxiety, as he testified to at his deposition.   However, a review of the evidence submitted in support of the motions for summary judgment and the oppositions thereto reveal a total lack of any evidence on this claim.   Nor is there any mention of these symptoms in the Defendants' statement of material facts or Kunz's response thereto.   At this stage of the proceedings, Kunz is required to "set forth

---

[7] I note that Kunz failed to address this argument in his opposition to McCarthy's motion.

specific facts showing that there is a genuine issue for trial" and "may not rest upon mere allegations." Anderson, 477 U.S. at 248.

Therefore, I recommend that the court grant summary judgment to the Northbridge Defendants on count II of the complaint and to all Defendants on the NIED claim in count IX of the complaint.

4.      Americans with Disability Act

Kunz asserts that the Defendant Police Officers discriminated against him based on his perceived mental disability in violation of the Fourteenth Amendment when it was determined that he should have a mental evaluation pursuant to Mass. Gen. Laws ch. 123, § 12(a).  (Docket #1 at ¶¶ 73-75).  Defendants assert that, because Kunz alleges that he was improperly admitted for a mental evaluation, he cannot now claim that he had a disability at that time and was discriminated against on account of said disability.  (Docket #51 at 15-16).  Defendants argue that the statute requires that the alleged discrimination occur against a person who has a disability, not a person who is perceived to have a disability.  (Docket #51 at 15-16).  Defendants further argue, and Kunz conceded at the hearing, that Kunz's claim fails if the application for his admission for involuntary hospitalization was appropriately made by the police in an emergency situation.  (Id. at 16).

As an initial matter, Defendants incorrectly interpret the operative statute.  Title II of the American with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the

essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  The term "disability" means, with respect to an individual:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1).  An individual meets the requirement of "being regarded as having such an impairment" if the individual "establishes that he or she has been subjected to an action prohibited under this Act because of an actual or <u>perceived</u> physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[8]  42 U.S.C. § 12102(3)(A) (emphasis added).  Hence, contrary to the Defendants' interpretation, the statute does not require that the alleged discrimination occur against a person who has a disability; it is enough if the person is perceived to have a disability.

At the hearing, Kunz's counsel identified the discriminatory act as the failure to afford process under Section 12.  As discussed above, the undersigned has found that Defendants have not demonstrated that they complied with the emergency procedure under section 12(a).  While the record currently before this court is devoid of evidence demonstrating that the Defendants' failure to comply with this statutory requirement was due to Kunz's disability, Kunz is not required to come forward with such evidence unless the issue was properly contested by the Defendants. <u>See</u> <u>Barbour</u>, 63 F.3d at 37 (stating that the burden to set forth specific facts showing there is a genuine issue for trial only shifts to the non-moving party when the party moving for summary judgment has properly supported its motion).  Therefore, I recommend that the court find that

---

[8] However, an individual will not be regarded as having such an impairment if the impairment is transitory, meaning that it has an actual or expected duration of six months or less, and minor.  42 U.S.C. § 12102(3)(B).

Kunz may assert a Title II claim on this basis and deny the Defendants' motion for summary judgment with respect to count III.

However, the scope of Kunz's Title II claim is limited to any failure on the Northbridge Defendants' part to ascertain the unavailability of "a physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker." A denial of Kunz's rights to public counsel services, to immediately contest the detention, and the opportunity for voluntary admission are not properly addressed to the defendants before this court. (See Docket #1 at ¶¶ 73-74; Docket #63 at 18). An examination of the statutory framework is instructive.

Pursuant to section 12, when a police officer applies for the hospitalization of a person for a three-day period at a public or authorized private facility, "such person shall be given a psychiatric examination by a designated physician immediately after his reception at such facility." Mass. Gen. Laws ch. 123, § 12(b). "If the physician determines that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness he may admit such person to the facility for care and treatment. Mass. Gen. Laws ch. 123, § 12(b). See Reida v. Cape Cod Hospital, 36 Mass. App. Ct. 553, 556 (1994) ("The admitting physician has the role of determining whether, in fact, a failure to hospitalize would create a likelihood of serious harm, in contrast to the [applicant], whose function is only to determine whether there is reason to believe that such may be the case.") (emphasis in original). However:

> No person shall be admitted to a facility under the provisions of [section 12] unless he . . . is given an opportunity to apply for voluntary admission under the provisions of paragraph (a) of section ten and unless he . . . has been informed (1) that he has a right to such voluntary admission, and (2) that the period of hospitalization under the provisions of this section cannot exceed three days.

Mass. Gen. Laws ch. 123, § 12(c).  Once a person is admitted, "the <u>facility</u> shall inform the person that it shall, upon such person's request, notify the committee for public counsel services of the name and location of the person admitted."  Mass. Gen. Laws ch. 123, § 12(b) (emphasis added). If the person "has reason to believe that such admission is the result of an abuse or misuse of the provisions of [section 12(b)], [he] may request, or request through counsel, an emergency hearing in the district court in whose jurisdiction the facility is located[.]"  <u>Id.</u>

The Defendants did not make a determination concerning Kunz's admission to Pembroke Hospital; rather that decision was made by the admitting physician.  Hence, if there was a failure to comply with Section 12(c)'s requirement that Kunz be given the opportunity to apply for voluntary admission, it would be attributable to the admitting facility, and Kunz cannot hold the Defendants liable.  Likewise, it is the admitting facility who is tasked with the responsibility of notifying the committee of public counsel services of the name and location of the person admitted upon that person's request.  Finally, once Kunz was admitted to Pembroke Hospital he was no longer under the control of Defendants and any interference with his rights to a hearing could not be due to the Defendants' actions.

5.    Monell

Pursuant to 42 U.S.C. § 1983, individuals have the right to sue those acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . [for] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  In that regard, a plaintiff must show that 'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'"  <u>Freeman v. Town of Hudson,</u>

714 F.3d 29, 37 (1st Cir. 2013) (quoting Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997)) (alteration in original).

It is well settled that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Instead, it must be shown that the "the municipality itself cause[d] the constitutional violation at issue." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (emphasis in original); see Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer."). The Supreme Court, in effort to prevent municipal liability from "collaps[ing] into de facto *respondeat superior* has set a very high bar for assessing municipal liability under Monell." Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

Under section 1983, wrongdoing can be directly attributed to the municipality "only if the violation occurs pursuant to an official policy or custom." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008). "A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority." Id. "Although liability may not be imposed on a municipality for a single instance of misconduct by an official without final policymaking authority, liability may be imposed on a municipality for 'a single decision by a final policymaker.'" Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 769 (1st Cir. 2010) (emphasis in original) (quoting Welch, 542 F.3d at 942). Whether a decisionmaker has final policymaking authority is a question of law determined by state and local laws, including descriptions of duties and obligations. See Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013); see also Sanoguet-Valentin v. Mun. Gov't of Mayaguez, No. 14-1182 (PAD), 2017 U.S. Dist. LEXIS 15730, at *3 (D.P.R. Feb. 2, 2017).

Here Kunz argues that the Northbridge Police's official policy was to follow the requirements of section 12(a), and, in this case, they failed to do so.[9] (Docket #63 at 15).  However, one single instance of a failure to follow set policy, which is all this record allows the court to infer, is not enough to establish municipal liability pursuant to section 1983.  See Rodriguez-Garcia, 610 F.3d at 769.  Kunz has not alleged, nor can this court find on the evidence before it that the Northbridge Defendants who effectuated his detention were final policymakers.

I therefore recommend that the court grant the Northbridge Defendants' motion for summary judgment with respect to count IV.

6.      Articles 12 and 14 of the Massachusetts State Constitution

In count X of the complaint, Kunz asserts a claim against Defendants pursuant to Articles 12 and 14 of the Massachusetts State Constitution.  (Docket #1 at ¶¶ 96-97).  However, there is no private cause of action directly under the Massachusetts Constitution; to the extent that Kunz seeks to bring a state constitutional claim, the appropriate vehicle for doing so is through the MCRA.  Almeida v. Rose, No. 12-11476-PBS, 2013 U.S. Dist. LEXIS 173031, at *23 (D. Mass. Dec. 9, 2013) (citing Martino v. Hogan, 37 Mass. App. Ct. 710, 720-21 (1994) (holding there is no authority upon which to base a damages claim or an equitable claim directly under the State's Declaration of Rights, and stating that the existence of the MCRA occupies the field, similar to that of 42 U.S.C. § 1983)).  Therefore, I recommend that count X of the complaint be dismissed.

---

[9] At the hearing, Kunz's counsel argued for the first time that section 12(a) is constitutionally inadequate in situations where involuntary psychiatric admissions are applied for by the police.  Hence, Kunz's counsel argued, the adoption by the Northbridge Police Department of the requirements of section 12(a) as their official policy resulted in the violation of Kunz's constitutional rights.  The undersigned will not consider the merits of this argument; a plaintiff is "not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."  Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006).

7.      Right of Privacy

Pursuant to Mass. Gen. Laws ch. 214, § 1B, "A person shall have a right against unreasonable, substantial or serious interference with his privacy."   While the adjectives "unreasonable," "substantial," and "serious" are connected by the disjunctive "or," courts have read the statute as requiring that the interference be both unreasonable <u>and</u> substantial or serious. <u>See</u> <u>Schlesigner v. Merrill Lynch, Pierce, Fenner & Smith, Inc</u>, 409 Mass. 514, 518 (1991) ("The statute was obviously not intended to prohibit serious or substantial interferences which are reasonable or justified. . . Likewise, we doubt the Legislature intended to commit scarce judicial resources to preventing an interference which could be characterized as unreasonable, but which is only trivial or insubstantial.").   Although most of the case law under the statute has involved public disclosure of private facts, "a plaintiff may also support a claim of invasion of privacy by showing that a defendant has intruded unreasonably upon the plaintiff's 'solitude' or 'seclusion.'" <u>Polay v. McMahon</u>, 468 Mass. 379, 382 (2014) ("The right which the plaintiffs claim was infringed upon is their right to be left alone.") (quoting <u>Ellis v. Safety Ins. Co.</u>, 41 Mass. App. Ct. 630, 637 (1996)).   At the hearing, Kunz's counsel indicated that he was proceeding under this function of the statute claiming that Defendants invaded his privacy by causing both his civil and criminal detention.

Generally, the question of whether an intrusion qualifies as unreasonable, as well as either substantial or serious, is one of fact. <u>Id.</u>   Factors considered include "the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." <u>Id.</u>   "In determining whether a defendant committed an unreasonable intrusion, [the court] balance[s] the extent to which the defendant violated the plaintiff's privacy interests against any legitimate purpose the defendant may have had for the intrusion." <u>Id.</u>

While the Northbridge Defendants did apply for Kunz's civil commitment, I find such interference reasonable as it furthered legitimate safety interests.  See Webster v. Motorola, Inc., 418 Mass. 425, 432-33 (1994) (holding defendant's legitimate business interest in ensuring its employee's safe operation of company motor vehicle outweighed employee's privacy interest and justified random urinalysis testing for drugs); O'Connor v. Police Comm'r of Boston, 408 Mass. 324, 328-30 (1990) (holding no invasion of privacy caused by warrantless, suspicionless drug testing of police cadets where police department's compelling interest in ensuring safety, maintaining integrity, and promoting confidence in law enforcement personnel outweighed plaintiff's interest in avoiding intrusive urinalysis procedures); E.T. v. Bureau of Special Educ. Appeals of the Div. of Admin. Law Appeals, 169 F. Supp. 3d 221, 251 (D. Mass. 2016) (holding that school administrator's search and seizure of student's notebook, the underlying purpose of which was to ensure school safety, was not sufficiently unreasonable to constitute a violation of student's privacy rights).  As noted above, the Northbridge Defendants had reason to believe that failure to hospitalize Kunz would create a likelihood of serious harm.

In his opposition, Kunz also argues that his privacy was violated by the Northbridge Defendants when they disclosed private medical information, such as Kunz being medically unstable, to McCarthy, the FBI, and the Fire Department EMTs.  (Docket #63 at 19).  Section 1B has been interpreted "to proscribe disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest."  Mulgrew v. Taunton, 410 Mass. 631, 637 (1991) (alterations omitted) (quoting Bratt v. Int'l Bus. Machs. Corp., 392 Mass. 508, 518 (1984)).  A review of the record fails to reveal any support for Kunz's contention that the Northbridge Defendants disclosed any of his private medical information to McCarthy.  See Tobin v. Fed. Express Corp., 775 F.3d 448, 451 (1st Cir. 2014) ("To prevail on [a

claim under Mass. Gen. Laws ch. 214, § 1B], the plaintiff must, at a bare minimum, carry the burden of proving that a disclosure took place.").  While the Northbridge Defendants did disclose private medical information to the FBI, i.e. the regional broadcast indicating that Kunz was mentally unstable (Docket # 57-5), this disclosure was clearly reasonable as it furthered legitimate safety interests.  See Webster, 418 Mass. at 432-33; O'Connor, 408 Mass. at 328-30; E.T., 169 F. Supp. 3d at 251.  Likewise, any disclosure of Kunz's private medical information to the Fire Department EMTs was reasonable as the EMTs necessarily required information as to why they were transporting Kunz, allegedly against his will, to the hospital.

I note that Kunz's claim for invasion of privacy as to the Town of Northbridge also fails pursuant to the Massachusetts Tort Claims Act.  Under the Massachusetts Tort Claims Act, municipalities cannot be held liable for the intentional torts of their employees.  See Mass. Gen. Laws ch. 258, § 10.  "Specifically, under the Massachusetts Torts Claims Act, 'public employers, but not their employees, are immunized from suit for intentional torts including invasion of privacy.'"  Federico v. Town of Rowley, No. 15-12360-FDS, 2016 U.S. Dist. LEXIS 169208, at *26 (D. Mass. Dec. 7, 2016) (quoting Tivnan v. Registrar of Motor Vehicles, 50 Mass. App. Ct. 96, 102 (2000)).

For these reasons, I recommend that the court grant the Northbridge Defendants summary judgment with respect to count XII of the complaint.

B.     Kevin McCarthy

1.     Section 1983

Kunz asserts that the Defendants "acting closely together and under color of state law, deprived plaintiff of his rights guaranteed by the United States Constitution and rights secured by federal law." (Docket #1 at ¶ 59).  Specifically, Kunz alleges that McCarthy called the Northbridge

and Haverhill Police about Kunz, may have worn a wire to record conversations with Kunz, and also falsely reported to the FBI about Kunz in an attempt to establish a foundation for McCarthy's unlawful conduct in October 2011.  (Docket #67 at 5).  Kunz alleges that McCarthy is therefore liable to him for the challenged conduct pursuant to 42 U.S.C. § 1983, which provides, in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

"[I]t is settled that the fact that private parties give the police information on which official action is then taken does not by itself convert the private parties into state actors."  Andersen v. Diorio, 349 F.3d 8, 13 (1st Cir. 2003).  "The limited case law on 'intertwining' requires a relationship far closer than merely furnishing the information – accurate or not – on which the police base their own judgment and action."  Id.

The fact that McCarthy called the Northbridge and Haverhill Police concerning Kunz does not, on its own, subject McCarthy to liability pursuant to section 1983.  There is no evidence that McCarthy was acting in concert with the Northbridge Police; instead, the evidence shows that the Northbridge Police challenged the accuracy of McCarthy's account and advised him that they were not the appropriate body to which to make a complaint.  Before he arrived at the Northbridge Police Station, Officer DeJordy informed McCarthy that he should report the assault to the Haverhill Police Department and that the Northbridge Police would not investigate the altercation.  (Docket #53-3 at ¶ 1).  Officer DeJordy stated in his report that, although McCarthy complained that Kunz had choked him and that his throat was hurting, DeJordy did not observe any markes on McCarthy's neck.  (Id. at ¶ 2).  Officer DeJordy also questioned McCarthy's account about the

amount of time that it took him to get to Northbridge after the alleged altercation, noting that he expected McCarthy approximately thirty minutes later than his arrival due to the length of time it takes to get from Haverhill to Northbridge.  (Id. at ¶ 3).  Officer DeJordy advised McCarthy several times during their conversation that he should be reporting the incident to the Haverhill Police on his way home.  (Id.).

With respect to Kunz's allegations that McCarthy falsely reported to the FBI about Kunz in an attempt to establish a foundation for his unlawful conduct, such action goes no further than the furnishing of information and, therefore, is not actionable.  This argument merely alleges that McCarthy tried to deceive the FBI, not that they were working in concert.

Finally, Kunz provides no evidentiary support for his contention that McCarthy may have worn a wire to record conversations with Kunz.  At this stage in the litigation, Kunz "may not rest on mere allegations[], . . . but must set forth specific facts showing there is a genuine issue for trial."  Barbour, 63 F.3d at 37.  Thus, the undersigned will not consider this allegation with respect to whether Kunz is a state actor.

Therefore, I recommend that the court grant McCarthy summary judgment with respect to count I of the complaint.

2.      The Massachusetts Civil Rights Act

In count VI of his complaint Kunz brings claims under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, against McCarthy alleging interference and/or attempted interference with his liberty, privacy, and due process rights under the United States Constitution and rights under the Massachusetts Constitution.  (Docket #1 at ¶¶ 87-88).

At the hearing, to alleviate any confusion, I specifically asked Kunz's counsel to identify the "threats, intimidation or coercion" employed by Defendants.  As with the Northbridge

Defendants, Kunz's counsel responded that McCarthy's misuse of the process was coercive. As discussed above, see section III.A.2.b supra, this argument impermissibly conflates the requisite threats, intimidation or coercion with the alleged constitutional violation, and a direct violation of a person's rights does not implicate the MCRA. See Muldoon, 2017 U.S. Dist. LEXIS 17105, at *9; Longval, 404 Mass. at 333.

As Kunz has failed to demonstrate the requisite threats, intimidation, or coercion required under the MCRA, I recommend that the court grant summary judgment to McCarthy on count VI of the complaint.

3.      Abuse of Process

"To prevail on an abuse of process claim 'it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purposes of the particular process employed.'" Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775 (1986) (quoting Beecy v. Pucciarelli, 387 Mass. 589, 595 (1982)). "More specifically, abuse of process has been described as a form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money." Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 (2000) (quotation omitted). "The three elements of the cause of action are that 'process' was used, for an ulterior or illegitimate purpose, resulting in damage."[10] Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636 (2010). "[T]he ulterior motive may be shown by showing a direct demand for collateral advantage; or it may be inferred from what is said or done about the process." Vittands, 49 Mass. App. Ct. at 406 (quoting Ladd v. Polidoro, 424 Mass. 196, 198 (1997)).

---

[10] For purposes of abuse of process, 'process' is limited to "writs of attachment, the process used to institute a civil action, and[] the process related to the bringing of criminal charges.'" Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389-90 (1975) (internal citations omitted).

At the hearing, Kunz's counsel argued that McCarthy complained of Kunz's conduct to the Northbridge Police with the ulterior purpose of framing Kunz for the arson in Haverhill.[11] However, Kunz has provided no evidence that this was McCarthy's purpose beyond his own supposition.  There is no evidence before this court that McCarthy mentioned the fires in relation to Kunz in either his discussion with the Northbridge Police or the Haverhill Police.  In fact, McCarthy could not have mentioned the fires to the Northbridge Police as they occurred after McCarthy arrived at the Northbridge Police Station.[12]  (See Dockets #53-3, 78).  Hence, at the time that McCarthy was alleged to be committing the abuse of process, no fires had occurred for which Kunz could be framed.  Because Kunz has failed to set forth specific facts showing that McCarthy had an ulterior purpose for complaining to the Northbridge Police, I hereby recommend that summary judgment be granted to McCarthy with respect to count VII.  See Anderson, 477 U.S. at 256 ("a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial").

4.     Malicious Prosecution

In count VIII of the complaint, Kunz asserts a claim of malicious prosecution, alleging that Defendants initiated his mental health admission and criminal arrest without probable cause and with malice.  (Docket #1 at ¶¶ 91-92).  Under Massachusetts law, there are three elements of a malicious prosecution claim; a plaintiff must establish that he was damaged because (1) the

---

[11] I note that, at the hearing, Kunz's counsel clarified that the complaint does not allege abuse of process with respect to McCarthy's interactions with the Haverhill Police.

[12] At the hearing, Kunz's counsel was under the mistaken belief that the fires occurred almost twenty-four hours prior to McCarthy appearing at the Northbridge Police Station.  Following the hearing, Kunz submitted a report from the Office of the State Fire Marshal indicating that the fire occurred between 11 pm and midnight on October 17, 2011. (Docket #78).  McCarthy arrived in the Northbridge Police Station, which is over an hour drive from Haverhill, at 11:08 pm on October 17, 2011.  (Docket #53-3 at ¶¶ 2-3).

defendant commenced criminal proceedings without probable cause, (2) with malice, and (3) that the original action terminated in his favor.  Correllas v. Viveiros, 410 Mass. 314, 318 (1991); see Yacubian v. United States, 750 F.3d 100, 108-09 (1st Cir. 2014) (citing Chervin v. Travelers Ins. Co., 448 Mass. 95, 103 (2006)).

Kunz's claim of malicious prosecution against McCarthy based on the Northbridge involuntary commitment fails with respect to the first element.  As recognized by Kunz, Mass. Gen. Laws ch. 123, § 12(a) establishes a civil commitment procedure.  See Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 778 (2008).  Hence, McCarthy cannot be said to have commenced criminal proceedings with respect to his interactions with the Northbridge Defendants.

Kunz's malicious prosecution claim against McCarthy based on the criminal proceedings against him in Haverhill also fails with respect to the first element.  Kunz was charged by the Haverhill Police with Assault to Murder, and those charges were later dismissed on January 23, 2013 at the request of the Commonwealth.  (DF 70).  While this is clearly a criminal proceeding, Kunz fails to offer any evidence disputing McCarthy's assertion that he did not give the Haverhill police a statement about the assault and battery.  The evidence to which Kunz cites does not stand for any opposite proposition.  (See Docket #64-1; Docket #64-9).  "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson 477 U.S. at 248 (alterations and quotation omitted).  I therefore recommend that summary judgment be entered for McCarthy on count VIII of the complaint.

5.    Intentional Infliction of Emotional Distress

Under Massachusetts law, a claim for IIED requires proof of the following elements:  (1) that the defendant "intended, knew, or should have known that his conduct would cause emotional

distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." <u>Polay v. McMahon</u>, 468 Mass. 379, 385 (2014).

> Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

<u>Id.</u> (quoting <u>Tetrault v. Mahoney, Hawkes & Goldings</u>, 425 Mass. 456, 466 (1997)). The conduct at issue must go "beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized society." <u>Id.</u> at 386 (quoting <u>Roman v. Trustees of Tufts College</u>, 461 Mass. 707, 718 (2012)).

The basis of Kunz's claim for IIED against McCarthy is the filing of a false police report. (Docket #67 at 9). In <u>Polay v. McMahon</u>, the Massachusetts Supreme Judicial Court was confronted with this same issue. The court noted that '[f]or a defendant's conduct to qualify as extreme and outrageous, the defendant must have acted 'without privilege.'" <u>Polay</u>, 468 Mass. at 386. The court affirmed the trial court's dismissal of the IIED claim, because under the "anti-SLAPP" statute, Mass. Gen. Laws ch. 231, § 59H, "an individual may not be sued for exercising the right to petition, including the right to file police reports," "unless the party bringing suit can show that the petitioning activities lacked any reasonable factual support or arguable basis in law." <u>Id.</u> at 386-88. "The motive behind such petitioning activity does not matter." <u>Id.</u> at 386.

On October 17, 2011, McCarthy called the Northbridge Police regarding an assault allegedly perpetrated on him by Kunz and threats allegedly made by Kunz against people he had a list of, including "Brian Petrocelli," a Northbridge Police Officer and Agent Aldman, an FBI Agent. (Docket #53-2 at ¶¶ 1-2; Docket #53-4). McCarthy later turned over the so-called "Hit

List" to Officer DeJordy.  (Docket #53-3 at ¶ 2).  McCarthy indicated that Kunz had told him that those were the names of people that were going to be killed.  (Id.).  Although Kunz denies these allegations, he does admit that he made the list.  (DF 29).  Northbridge Police Officers were later able to confirm that an Agent Joseph Aldman worked in the Worcester FBI Office and that he had previously interviewed Kunz.  (Docket #53-2 at 1).  While the Northbridge Police do not have an Officer Petrocelli, a Sergeant Petrinelli does work for the department.  (Id.).  Kunz also admits to being with McCarthy at McCarthy's home until approximately 10:30 pm on October 16, 2011, which encompasses the period of the alleged assault.  (PF 30).  At that time, Kunz and McCarthy were involved in a serious business dispute.  (Docket #1 at ¶ 14).

The undersigned finds that this evidence demonstrates that McCarthy had reasonable factual support for making his report to the Northbridge Police Department.  See Benoit v. Frederickson, 454 Mass. 148, 154 n.7 (2009) (stating that under anti-SLAPP statute reasonable factual support constitutes "evidence that, if believed, would support a finding in the defendant's favor").  Because McCarthy's petitioning activity was privileged under the anti-SLAPP statute, I recommend that he be granted summary judgment as to count IX of the complaint.

6.      Negligent Infliction of Emotional Distress

For the reasons stated above, see section III.A.3 supra, I recommend that the court grant summary judgment to McCarthy on the NIED claim in count IX of the complaint.          7.

Articles 12 and 14 of the Massachusetts State Constitution

For the reasons stated above, I recommend that count x be dismissed against McCarthy. See section III.A.6, supra.

8.      Right of Privacy

As an initial matter, I find that, to the extent Kunz's privacy was invaded, McCarthy cannot be said to be the cause of such invasion.  To support such a finding, Kunz must demonstrate that McCarthy was acting in concert with the Northbridge Defendants or the Haverhill Police.  As discussed above, the evidence does not support this contention.  Thus, the decision to detain Kunz was made by an independent decision maker.  Furthermore, even if McCarthy could be said to have caused an interference with Kunz's privacy, I would find any such interference reasonable as it furthered legitimate safety interests.  See section III.A.7, supra.  I therefore recommend that the court grant McCarthy summary judgment with respect to count XII of the complaint.

IV.     CONCLUSION

For the foregoing reasons, I RECOMMEND that the motion for summary judgment filed by the Northbridge Defendants (Docket #50) be ALLOWED IN PART AND DENIED IN PART. Specifically, I recommend that the motion be DENIED with respect to count III as to all Northbridge Defendants and with respect to counts VII, VIII and the IIED claim in count IX as to the Defendant Police Officers.   I RECOMMEND that the motion be ALLOWED in all other respects.   I further RECOMMEND that the motion for summary judgment filed by McCarthy (Docket #54) be ALLOWED.[13]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[13] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).